Supreme Court. New York General Term, February, 1861. *Clerke, Sutherland* and *Allen,* Justices.

William Mulligan, plaintiff in error, *v.* The People, defendants in error.

On the trial of a prisoner for attempting to discharge a pistol with the intent to kill, &c., under 2 *R. S.,* 665, § 36, the prisoner's counsel requested the judge to charge "that the pointing of an uncocked Colt's revolver at a person is not an attempt to discharge the weapon," and the judge refused so to charge, and charged that it was a question of fact for the jury to decide, and not a question of law for the decision of the court; Held, that the ruling of the judge was erroneous, and the prisoner, having been convicted, the judgment was reversed on writ of error, and a new trial ordered.

A conviction for an attempt to discharge a pistol, under the statute referred to, cannot be had, where the individual indicted proceeded no farther toward an actual discharge or shooting than to raise and point the pistol, uncocked, at the party threatened.

A threat made by the prisoner at the time would constitute no part of the attempt to discharge the pistol; it would only be evidence of the intention of the prisoner.

ERROR to the Oyer and Terminer of the city and county of New York, where the plaintiff in error was tried and convicted, before Mr. Justice GOULD, of having attempted to discharge a loaded pistol at one Oliver, with intent to kill him, and was sentenced to four years' imprisonment in the State prison.

At the close of the evidence, the judge was requested by the prisoner's counsel, to charge that the pointing of an uncocked Colt's revolver at a person, is not an attempt to discharge the weapon. The judge refused so to charge, holding that it was a matter of fact to be left to the jury, and not a question of law to be decided by the court, to which the prisoner's counsel excepted.

Other questions were raised on the trial, but not having been considered by the court, on review, it is unnecessary to state them.

*James T. Brady*, for the plaintiff in error.

*Nelson J. Waterbury* (District Attorney), for the People.

*By the Court*, ALLEN, J. The plaintiff in error was convicted of attempting to discharge a loaded pistol at one Oliver, with intent to kill him, and sentenced to the State prison for four years, upon which conviction, error was brought to this court.

Several questions arise upon exception to the rulings and decisions of the learned judge, in the progress of the trial, which it will not be necessary to consider, if my brethren concur with me upon the main question presented by the record.

The prisoner was in a common gambling house, of which Morrissey, one Dancy, and others, were proprietors, and while conversing peaceably with Dancy, was ordered out of the house by Morrissey. Not leaving in pursuance of the request, Morrissey procured the attendance of Oliver, who was one of the police officers of the city of New York, and requested him to remove the prisoner from the premises. The prisoner refused to go, or did not leave, at the request of the officer, and

Mulligan v. The People.

the latter advanced toward him with a view to eject him from the house. The evidence tended to show that the prisoner retreated as the officer advanced, and took from his pocket a loaded pistol and pointed it at the officer, using threatening language, indicating an intent to discharge it if the officer put his hand on him, or advanced toward him. The pistol was not cocked.

The prisoner was not in the act of committing an offense against the law, and was not liable to arrest by the officer, and there was no resistance to Oliver as an officer. While attempting to remove the prisoner from the house, Oliver was not in the line of his duty as a member of the police. The house was a public gaming house to which the prisoner had on other occasions resorted for play, and aside from the license implied from the character of the house, the actual permission before given to the prisoner to be and remain in the house, was an invitation and express license to him to enter it at any and all times until the license should be revoked. He was not, therefore, a trespasser, or guilty of a breach of the peace by entering the house at the time of the alleged assault. But the license was revocable at the pleasure of the proprietors, and when revoked, he could neither lawfully enter or remain upon the premises.

Notwithstanding the illegal and offensive character of the business of Morrissey and Dancy, the premises and the possession of the proprietors were under the protection of the law, and no one had the right to intrude upon them against the wishes of the owners. There is some evidence that the officer considered the business of the house, as well as the house itself, under the protection of the law, and the proprietors entitled to the aid of the police force to preserve order in carrying on the business rather than in suppressing it, and thus effectually preventing breaches of the peace and violation of the law. It is proper to say that in the excess of zeal to protect the gambling house and its business, Oliver acted without and against the orders of his superior, Captain Dilks.

Had he followed the instructions of Captain Dilks, he would have kept within the exact line of his duty.

Breaches of the peace resulted almost necessarily from the character of those who were drawn together by the attraction of the place, and the business of the house was a nursery not only for those offenses which come under the head of breaches of the peace, but for every vice and crime that infest the community, and why this police officer should have deemed it his duty so far to protect and encourage gambling, and a house for gambling, as to interfere with those who were not guilty of any offense, and were not committing a breach of the peace, merely because their presence was offensive to the keeper of the house, it is not easy to see. He was literally using his office as a "shield" for a public nuisance. The remark of the prisoner to the officer: "Don't you see that this is a gambling house: you had better attend to this than to arrest me," was very proper, and if the officer had heeded it, and the direction of Captain Dilks, and merely done his duty, no offense would have been committed by the prisoner, and this conviction would not have been had. Perhaps even the Metropolitan police cannot suppress all the gaming-houses, but they are not bound to undertake their regulation and management. As there was no breach of the peace or other offense committed in the presence of the officer, he, as such, had no authority to interfere with or molest the prisoner, and the display of his "shield" did not add to his powers. All the authority he had was as the servant of Morrissey, the proprietor of the house. As such he could have done, at his request, precisely what Morrissey himself could have done, that is, upon the refusal of the prisoner to leave the house, upon being requested so to do, he could have removed him, using just that measure of force necessary to accomplish that purpose and no more. The prisoner could not have been indicted for resisting Oliver as an officer. (*Reg.* v. *Mabel*, 9 *Car. & Payne*, 474.) The officer went beyond his duty as such in attempting to remove the prisoner, and was not, therefore, within the protection of the law as an officer. (*Wheeler* v.

*Whitney, Id.,* 262.) But as the servant of Morrissey, and acting for him, he had a right to remove the prisoner, and as no question arises upon an alleged resistance to a public officer in the discharge of his duty, so there is no question as to the degree of force used by the officer in the expulsion of the prisoner. The principal and only important question is upon the construction of the act under which the prisoner was convicted, and that question was directly presented by the request of the prisoner's counsel to the court, to charge the jury that the pointing of an uncocked Colt's revolver at a person was not an attempt to discharge the weapon, which instruction was refused, and the jury were charged in substance that it was for them to say, upon the evidence, whether the act was or was not an attempt to discharge the pistol.

The statute under which the prisoner was convicted declares that "every person who shall be convicted of shooting at another, or attempting to discharge any kind of fire arms, &c., with the intent to kill, maim, &c., shall be punished," &c. (2 *R. S.,* 665, *sec.* 36), and the question presented is, whether a conviction can be had for an attempt to discharge a pistol when the individual indicted has proceeded no further toward an actual discharge of shooting than to raise and point the pistol, uncocked, at the party threatened. There was no evidence of an attempt to cock the pistol or to pull the trigger, and the jury would have been warranted in finding that the prisoner merely raised the pistol and pointed it at the officer, making the qualified threat before stated. The instruction was properly asked for upon the evidence. The threat constituted no part of the attempt to discharge the pistol, and was only evidence of the intention of the prisoner. The statute quoted does not declare that every person who shall shoot or attempt to shoot at another shall be punished upon conviction as therein prescribed, but it is that every person who shall shoot, or shall attempt to discharge any fire arms, &c., shall be punished, &c., evidently indicating that the attempt, the act preparatory to the principal act prohibited, must be proximate and an attempt to do the specific thing named, to wit, dis-

charge the gun or other fire arms. The statute is not aimed
at, neither is the indictment and conviction for an assault
with intent to kill. A person might make an assault with
loaded pistol in his hand, and yet make no attempt to dis-
charge it, and would not be within the provision of the
statute. The English statutes, as well (1 *Vict.*, *ch.* 85) as
the prior statutes for which that was a substitute, are somewhat
more marked and distinct in their language than our statute.
They are to the effect that " whosoever shall shoot at any
person, or shall, by drawing a trigger, or in any other manner,
attempt to discharge any kind of loaded arms at any person,
&c., shall be liable," &c. The principal difference between
our own statute and that of 1 *Vict.*, is that the latter punishes
an " attempt to discharge a gun, &c., by drawing a trigger, or
in any other manner," and our own punishes an attempt to
discharge a gun, without referring to the means; that is, pun-.
ishes the attempt to discharge a gun in any manner, which is
no broader than the expression " any other manner" in the
English statute. Any act toward the discharge of a loaded
gun, and calculated to accomplish this purpose, would . be an
attempt, under the English act, and nothing short of this
would constitute the offense under the Revised Statutes. Our
statute was not intended to differ from the English statutes,
except by providing a mitigated punishment for the attempt,
and thus distinguishing it from the consummated offense,
which the English acts did not. (*Rev. Notes*, 3 *R. S.*, 2*d ed.*,
815.) That which would not be an attempt to discharge a gun
in any manner other than by drawing the trigger, under the
English act, would not be an attempt to discharge it under the
Revised Statutes of this State. The very question made here
was decided in *Reg.* v. *Lewis* (9 *Car. & Payne*, 523), by
ARABBIN, Sergeant, after consulting with PATTERSON, J., and
the jury were instructed that to sustain an indictment for
attempting to discharge a loaded blunderbuss at the prose-
cutor, there must be something more than the mere presenting
of the blunderbuss, and that some act must be shown to have
been done by the prisoner to satisfy the jury that he did in

fact attempt to discharge the blunderbuss. The object of the English and our own statute is the same, to punish proximate attempts, those attempts which immediately lead to the discharge of loaded arms. (*Reg.* v. *St. George*, 9 *Car. & Payne*, 483.) It is not an attempt to discharge a loaded gun or pistol to put oneself in a situation in connection with the gun or pistol that it may be discharged. A mere getting it in readiness to discharge is not an attempt to discharge it. Upon the trial, an assault with intent to kill was confounded with the specific, statutory and entirely different offense charged, an attempt to discharge a loaded pistol with the like intent. The act, the attempt to commit which was made an offense, was the discharge of fire arms. No matter what other offense was committed against the laws, or the person of the officer, if this offense was not committed, the prisoner was wrongfully convicted. It is far from certain that any offense was committed by the prisoner, but of that we are not the judges. We are only to decide upon the present conviction.

The prisoner may be, as was very strenuously urged, a very bad man, but he is nevertheless entitled to the same measure of justice, and to be judged and acquitted, or condemned, by the same rules of evidence and of law which are applied in every other case. It will not tend to make bad men better to convict and punish them without or against law. The laws and the administration of justice will not be more respected to have it understood that rules of law and constructions of statutes can be made to bend to the exigencies of particular cases, and that men can be condemned for general bad character rather than upon proof of specific offenses. In passing upon evidence, judging of acts and intents, and deciding, as a question of fact, upon the guilt or innocence of a party, character is an important element, and in a doubtful or balanced case may properly turn the scale, but not so in passing upon legal questions. They are to be decided as abstract questions, and penal statutes are to be construed by the same rules, whatever may be the character of the individual to be affected by the decision. There may have been an assault with intent

to do bodily harm or to kill. (*Hays* v. *The People*, 1 *Hill R.*, 351.) If it be conceded that the prisoner could have been convicted of an attempt to kill, by reason of having done an act preparatory, or taken one step toward the commission of the offense, it still does not follow that he has attempted to discharge the pistol. He might be said to have attempted murder had he solicited another person to shoot the officer, but that would not have been an attempt to discharge the pistol, the specific offense charged. (*Rex* v. *Higgins*, 2 *East R.*, 5; *People* v. *Bush*, 4 *Hill R.*, 133.) An attempt is an endeavor to do an act carried beyond mere preparation, but falling short of execution of the ultimate design. (*Bouvier's Law Dic.*) Loading a pistol would be a preparation to shoot, but not an attempt to discharge. So, to get possession of a pistol, to take it from the pocket and to point it, would be a preparation to discharge it, but not an attempt to discharge it. It may not always be easy to determine where the line is which separates a preparation to perform a given act from an attempt to perform the act. But the act which is characterized as an attempt must be proximate to the principal thing to be accomplished, a means to the end, and the pointing of a pistol uncocked is not an attempt to discharge it, punishable under the statute. Fire arms are usually discharged by drawing a trigger, but they may be discharged in any way by which the powder can be ignited and made to explode, and the attempts to discharge may be as diversified as the means of discharge are various, but can only be by some act, which, carried out and perfected, will result in a discharge.

The conviction must be reversed, and a new trial granted.[1]

---

[1] This case was carried on behalf of the people, by writ of error, to the Court of Appeals, where the judgment of the Supreme Court was affirmed.